IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E & J GALLO WINERY, a California corporation,<br><br>        Plaintiff,<br><br>   v.<br><br>PROXIMO SPIRITS, INC. et al.,<br><br>        Defendant. | Case No. 1:10-cv-00411 LJO JLT<br><br>ORDER DENYING DEFENDANTS MOTION TO PRECLUDE THE TESTIMONY OF GERALD FORD<br><br>(Doc. 152) |

Defendants /counterclaimants Proximo Spirts, Inc. and Agavera Camichines, S.A. de C.V.[1] filed a motion to preclude the testimony of Plaintiff/counterdefendants E. & J Gallo Winery, Tequila Supremo, S.A. de C.V. and Ecco Domani USA, Inc.[2] expert Gerald Ford. Gallo filed an opposition to the motion, and Proximo/Agavera filed a reply. The Court has carefully considered the parties' submitted papers and the parties' arguments made during hearing on this matter. For the reasons set forth below, the Court **DENIES** the motion.

**I.**   **BACKGROUND**

Gallo filed this Declaratory Judgment Act, 28 U.S.C. §§2201-2202 ("DJA"), action seeking a declaration that Gallo's "Familia Camarena" tequila bottle and packaging does not infringe on the

---

[1] Hereafter, referred collectively as "Proximo/Agavera"

[2] Hereafter referred collectively as "Gallo"

1

trademark or trade dress of "1800 Tequila."  In response, defendants Proximo/Agavera filed a counterclaim against Gallo alleging improprieties in Gallo's respective trademark applications for the design marks of the Familia Camarena tequila bottle and seeking a declaratory judgment that the applications were void.[3]

**II.     Proximo/Agavera's Motion to Exclude Expert Report of Gerald Ford**

   **A.     Dr. Ford survey and report**

Proximo/Agavera moves to exclude Gallo's the expert testimony of Gerald Ford along with his report.  Gallo asserts that its expert testimony is intended address the central issue in this case as to whether consumers were confused by the any alleged similarities between Gallo's and Proximo's bottle design. (See  Doc. 152-1 at 5, Ford Decl., ¶2)

According to Dr. Ford's declaration, initial questions of the survey were patterned after questions similar to the surveys used and addressed in Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366 (7th Cir. 1976).  (Doc. 155 at 13, fn. 6)  In that case, Union Carbide, which sold batteries under the EVEREADY trademark, sued Ever-Ready Inc., who manufactured light bulbs bearing the Ever-Ready name.  Id. at 370-71.  To determine whether consumers were likely to confuse the source of defendant's bulbs with Union Carbide's EVEREADY brand, participants (in one of the two surveys employed), were shown a picture of the Ever-Ready light bulbs with its mark and were asked who produced the bulbs and asked to name other products produced by the same company. Id. at 385-86.  More than fifty percent of the interviewees indicated that the light bulbs shown to them were either made by Union Carbide or by the company that made the EVEREADY batteries.  Id.  The Seventh Circuit determined that the district court erred when it found that the surveys were entitled "to little, if any weight" and affirmed that the use of the surveys as valuable assistance when determining whether there exists a likelihood of confusion between the two products.[4]  Id. at 387.

---

[3] More specifically, Proximo alleges that the application filed by E & J Gallo contained fraudulent representations so that the application filed by E & J Gallo as well as the application filed by Tequila Supremo, S.A. de C.V. are void.  Proximo seeks an order directing the Commissioner of the United States Patent and Trademark Office to cancel those applications and registration because they fail to comply with one or more requirements of the registration.

[4] According to at least one authority, the Eveready format is now a standard survey format and has been explicitly approved for use in a number of cases.  5 McCarthy on Trademarks and Unfair Competition, § 32:174 at 32–290, 291 (4th ed. 2002):  James Burrough, Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266 (7th Cir. 1976); E. & J. Gallo Winery v. Gallo

2

In the instant case, interviewers, who were directed by Ford Bubala and Associates but employed by independent interviewing organizations, surveyed 432 consumers who reported that were likely to purchase a 750-milliliter bottle of tequila with an approximate cost of twenty dollars within the next three months. (Doc. 152-1 at 11). Those who indicated that they would make such a purchase, were provided either the Familia Camarena tequila bottle (for those participating in the test group) or a different shaped tequila bottle with the Familia Camarena labeling (for those participating in the control group) and instructed to view the bottle as if they had seen it in a store and was considering purchasing the product. (Doc. 152-1 at 13). Once each participant indicated that they were ready, the were asked a series of questions which included but was not limited to:

1. "Who or what company" did the participant believe "put out" the Familia Camarena bottle?

2. Assuming the participant identified a company, whether that company "put out" other brands and if they did, which other brand or brands? For each other brand named, participants were asked why they thought that the other brand was "put out by the company" that the participant believed produced the Familia Camarena product?;

3. Whether the product was "put out" with "the authorization or approval of any other company or companies" and if so, which other company or companies?

4. If participants indicated that they believed that the produce was put out with either the authorization or approval of any other company, the interviewer then asked the participant why they thought so.

(Doc. 155 at 12-16).

According to Dr. Ford, none of the survey participants who viewed the Familia Camarena tequila bottle indicated that they believed that the Familia Camerena tequila was either produced or distributed by the company that produced the 1800 tequilia. (Doc. 155 at 17). In addition, Dr. Ford reported that only three participants, who were shown the Familia Camarena tequila bottle, stated that they believed that the 1800 tequila was another brand of tequila "put out" by the company that "puts out" the Familia Camarena tequila. (Id. at 18). In light of these results, Dr. Ford concluded that there was no likelihood of confusion among consumers between the Familia Camarena product and the 1800 tequila brands based upon the design of the bottles. (Id. at 26).

---

Cattle Co., 1989 WL 159628 (E.D. Cal. 1989), modified, aff'd, 955 F.2d 1327 (9th Cir. 1992), amended, 967 F.2d 1280 (9th Cir. 1992).

### B.     Proximo/Agavera's Contentions

Proximo/Agavera urges the Court to exclude Dr. Ford's evidence on the grounds that it is inadmissible under the principles set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137, (1999).  Proximo/Agavera argue that Daubert holds that scientific opinion testimony may not be admitted under Federal Rule of Evidence 702 unless it is relevant and based upon a reliable foundation and that Kumho extended Daubert's rule to nonscientific expert testimony and determined that the Daubert admissibility factors are not to be rigidly applied.

Specifically, Proximo/Agavera argue that Dr. Ford's survey, based on the Eveready format, was inappropriate to determine whether consumers were likely to be confused between 1800 tequila and Familia Camarena tequila. (Doc. 152 at 3, 8-9). Proximo/Agavera assert that the Eveready methodology is appropriate only where participants in the survey have an "immediate recall or unaided awareness of the senior trademark" (here the 1800 Tequila trade dress).[5]  (Id. at 2).  Proximo/Agavera argue that because consumers do not have a similar widespread recall or awareness of 1800 tequila, Dr. Ford's survey is so flawed as to be unreliable.  (Id. at 8).  In addition, Proximo/Agavera argue that the Ford survey should be excluded pursuant to Federal Rule of Evidence 403, because its probative value is substantially outweighed by its prejudicial effect. (Id. at 7).

### C.     Discussion

Although the admissibility of survey evidence is governed by Daubert, the Ninth Circuit has held that "survey evidence should ordinarily be found sufficiently reliable under Daubert.  Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." Southland Farms v. Stover Seed Co., 108 F.3d 1134, 1143 n. 8 (9th Cir.1997).  The Ninth Circuit has explained that a survey may be admitted as long as it is conducted according to accepted principles and is relevant.  Wendt v. Host International, Inc., 125 F.3d 806, 814 (9th Cir.1997).  Moreover, "[t]echnical unreliability goes to the weight accorded to a survey, not its admissibility," and that the better course is to "admit the survey and discount its probative value."

---

[5] Proximo/Agavera list "CocaCola," "Harley-Davidson," and "Eveready" as examples of products possessing about which consumers have sufficient recall or awareness to make the Eveready methodology appropriate. (Doc. 152 at 2).

4

Prudential Insurance Co. ., v. Gibraltar Financial Corp., 694 F.2d 1150, 1156 (9th Cir.1982). Likewise, the Ninth Circuit has opined that the admissibility of a survey is a question of law:

> Treatment of surveys is a two-step process. First, is the survey admissible? That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge. Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility. These are issues for a jury or, in a bench trial, the judge.

Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001).

Despite Clicks' two-pronged approach, Proximo/Agavera do not directly challenge Dr. Ford's expertise and it appears that no challenge can seriously be mounted given Dr. Ford's extensive experience and training that spans 35 years.[6] (Doc. 152-1 at 5-6, 18-19) As to the relevance of the survey results, they conclude that because the survey is so flawed, it has no relevance to the issues. However, this combines Clicks' two-step process rather than analyzing the steps separately.

The Court finds that the survey has the tendency of proving that there is no likelihood of confusion between the marks at issue. Thus, it is relevant. Fed. R. Evid. 401. The tougher question is whether it was conducted according to accepted principles though the parties agree that the Eveready method or the "standard survey format" is the "gold standard" for determining whether there is a likelihood of confusion. The issue raised in this motion is whether this survey technique should have been used here where, Defendants contend, there is insufficient awareness of the 1800 brand.

Dr. Ford testified that he had no opinion as to the strength of the mark or the trade dress (Doc. 169-1 at 35) but noted that Defendants' pleadings claim that the 1800 brand is the "fifth best selling tequila in the United States. It's been on the market for 30 years. And then as I believe, if I am quoting your pleadings correctly, millions of dollars with of advertising promotion. So the survey design that

---

[6] In fact, Dr. Ostberg agreed that Dr. Ford "decidedly" has a high reputation and he has an "extremely high regard" Dr. Ford and stated that, "In general, it is my belief that Dr. Ford and his company does a very credible job." (Doc.160-3 at 11)

5

was employed here is a standard survey design."[7, 8] Id. at 33. Dr. Ford clarified though, that in his opinion the strength of the trade mark doesn't impact the survey design. Id. at 41-44.

Dr. Ford was asked whether it was ever necessary to show survey participants other products along with the junior product if these other produces "may be observed by the respondents at the same time or reasonably contemporaneous with observing the junior" product at the time of the purchase decision. (Doc. 169-1 at 46.) Dr. Ford, reported that he had never come across an instance when doing this was required but could not say it never would be required. Id. at 46-47. He clarified, "I don't know that I would go so far as to say never. It's not traditional. The vast majority of standard surveys that are done and offered as survey evidence are done in a manner the same as the one that we conducted here." Id. Indeed, Dr. Ford disputed that the Eveready methodology presumes that the survey respondents have a high level of awareness of the senior mark. Id. at 52. He stated, "I don't think the Eveready design presumes anything. It measures the reaction to stimulus . . . It takes a snapshot of time whether or not particular stimulus and these questions that are posed to respondents who are purchase – potential purchasers of this class or good of services, whether that creates a mental association that is strong enough to indicate a likelihood of confusion." Id. at 52-53. Dr. Ford denied that the survey participants had to have "top-of-the-mind awareness" of the 1800 mark to obtain valid data in his survey and cited the fact that in Eveready, only a small percentage actually knew that Eveready was manufactured by Union Carbide. Id. at 55. Finally, Dr. Ford admitted that he did not ask survey respondents to name tequila brands but noted that no one he knew of had ever taken such an approach including Defendants' expert, Dr. Ostberg. Id.

In their challenge to Dr. Ford's report, Proximo/Agavera argue that Dr. Ford should have approximated real world conditions such that survey participants should have been shown the Familia

---

[7] Notably, Dr. Ostberg agreed that there is a relationship between the level of unaided awareness of the mark and each of the factors identified by Dr. Ford. (Doc. 169-3 at 15-19)

[8] In fact, Defendants allege in their counterclaim that "1800 Tequila is currently one of the top five selling tequila brands in the United States," "substantial sums have been expended on promotion and advertising in order to establish and maintain consumers' awareness and recognition of the 1800 trade Dress and to create an association in their mind [sic] between the 1800 Trade Dress and its source and origin" and "long before the acts of the counter-claim defendants complained of herein, and as the result of the promotion and sale of 1800 Tequila, the 1800 Trade Dress has acquired a valuable reputation and distinctiveness and is not recognized by consumers as originating from and being associated with a single source." (Doc. 85 at 8)

Camarena bottle *and* the 1800 bottle. They assert that because this is how the two tequilas are displayed in liquor stores, failure to show both bottles guaranteed that Gallo's survey would result in a conclusion that there was no likelihood of confusion between the two because Dr. Ford's survey required participants to have immediate recall of the 1800 tequila trade dress or be determined to not be confused. (Doc. 152 at 2, 4) Proximo/Agavera argue that given these circumstances, where the mark is not well-known and the products are displayed together, the preferred survey method is not Eveready, but "Squirt." Toward this end, they criticize Dr. Ford who testified that he found the Squirt method to be inappropriate.

However, the journal article cited by Agavera/Proximo lends credence to Dr. Ford's rejection of the Squirt method. Indeed, in the article the Squirt method is derided and surveyors are warned, "the Squirt same-company/different-company question is not neutral, but 'strongly suggests a possibility that might not have occurred to the interviewees–the products are made by the same company.' See also Shari S. Diamond, Reference Guide on Survey Research, Reference Manual on Scientific Evidence 251 (2000) (hereinafter Diamond, Guide) ('Closed-ended questions . . . may remind respondents of options that they would not otherwise consider or which simply do not come to mind as easily.'); Richard J. Leighton, Using Daubert-Kumho Gatekeeping to Admit and Exclude Surveys in Lanham Act Advertising and Trademark Cases, 92 TMR 743, 781 (2002) (closed-ended questions 'often indicate to respondents areas of interest to the surveyor'). '[T]he mere putting of [the] question creates the impression of a relationship.' Kargo Global, Inc. v. Advance Magazine Publishers, Inc., 2007 U.S. Dist. LEXIS 57320 *26 (S.D.N.Y. 2007). The article continued,

> Over time, the Squirt format has come to be used in cases where the accessibility of the senior mark in consumers' memory is low to non-existent, so that it must be made externally available to respondents as part of the survey design. **Because a Squirt test uses closed-ended questions, it has been historically criticized by pundits and the courts.**

Swann, Jerre B., "Likelihood of Confusion Studies and the Straitened Scope of SQUIRT*," The Trademark Reporter, emphasis added.

Despite reliance by Proximo/Agavera on the report of their retained expert, Dr. Henry Ostberg, to support their argument that Dr. Ford should have used the Squirt method, in his report Dr. Ostberg

7

does not advocate this approach.[9] Instead, in his report he opines that the Ford survey is flawed because there was no attempt to determine the degree of familiarity with the 1800 brand among those surveyed. (Doc. 152-1 at 28-29) He reports, without any citation to authority, that a plaintiff who knows that the senior mark is not widely known and who wishes to skew survey results, will use the Eveready methodology because its results militate against a finding of likelihood of confusion.[10] Id.

Rather than suggesting that the 1800 bottle should have been shown the participants and closed-ended questions asked–as Squirt requires–Dr. Ostberg's report argues only that they should have been asked to name the tequila brands of which they were aware as a basis for determining whether they would be able to recall the 1800 mark. (Doc. 29-30) However, as the Swann article makes clear doing so would have imperiled the admissibility of Dr. Ford's survey.

> The analysis below confirms, as to strong marks, the gold standard status of Eveready. As to Squirt, it suggests that the use of closed-ended questions should not be the issue. Rather, the latter format should be sanctioned where it is limited to the conditions of its origin (directly competing or substantially overlapping goods), i.e., where the stimuli proximately tested in the format appear, in fact, proximately in the marketplace. **Where brand strength is uncertain, or in a Circuit that stresses the similarity of marks as a confusion factor, [Footnote] a surveyor may consider "going both ways" [Footnote]–an as yet judicially untested, but intellectually intriguing alternative.**

Swann, at 470.

On the other hand, though the Court has thoroughly reviewed the Swann article, the Court has little information as to Swann's expertise or whether his article was thoroughly reviewed by his peers such that the Court can accept it as authoritative.[11] Certainly, neither Drs. Ford nor Ostberg vouch for it. Dr. Ford noted, in response to Defendants' question whether the Swann article was "widely known," stated,

> I don't know if it's widely known. It's written by Jerre Swann.
> Q. Right. Is Jerre Swann an expert in the field of likelihood-of-confusion surveys?
> A. I think that's an unfair question. Jerre Swann is a lawyer.
> Q. Okay. Can you answer my question, though?

---

[9] At his deposition though, Mr. Swann testified that had he conducted a survey in this case, he would likely have used an array or Squirt method. (Doc. 169-3 at 14-15)

[10] The court cannot square Dr. Ostberg's high regard for Dr. Ford with Dr. Ostberg's seeming assertion that Dr. Ford purposely skewed the survey toward Plaintiff's ends.

[11] Moreover, the article itself contradicts other authors on the same topic, notes disagreement among authors on various survey questions and questions portions of the Eveready method. See e.g. Swann, at n. 11, 12, 13, 16, 40

8

| | | |
|---|---|---|
|1| A. | I don't know how to answer your question. I think Jerre has a lot of opinions. He has been active in the trademark bar. He writes viciously. He is a close personal friend. But we don't agree on everything together, so -- |
|2| | |
|3| Q. | Okay. With that, I will move on. |

(Doc. 169-1 at 71) At his deposition, Dr. Ford disagreed with nearly every point taken from the Swann article. Id. at 72-77. Thus, though Mr. Swann asserts that the Eveready method is not the proper tool where the brand awareness is weak, the Court has no basis for determining whether because Mr. Swann says its so that, indeed, it is so. Likewise, though Dr. Ostberg asserts that the Eveready method should not be used when there is not a high mark awareness, he testified that he was unaware of any court that had so found and was unable to cite to any authoritative, peer-reviewed article that took this position and mentioned the Swann article only when counsel referred to it. (Doc. 160-3 at 4-5, 7) Instead, he asserted that this position was "common sense." Id. at 4-5.

Proximo/Agavera take issue with Plaintiff's assertion that there is high consumer awareness of 1800 Tequila. They argue that what is important for considerations of the "'top-of-the-mind' awareness"– which would justify the use of the Eveready survey format– is not the awareness of the trade mark but the trade dress. (Doc. 168 at 9-10) Moreover, they discount their own expert's opinion, Mr. Frankss, that the 1800 Tequila is "ubiquitous" as irrelevant to the considerations (Id.), despite that Dr. Ostberg testified that in his earlier Jeep case, he used the Eveready method without testing for the level of unaided awareness because "you see [Jeep vehicles] on the road all the time. I thought and I was certainly given information that Jeep was widely driven and on the roads at that particular time." (Doc. 169-3 at 40-42)

However, even if the Court agrees with the argument that it is the level of unaided awareness of the trade dress, rather than the trade mark, that determines the appropriateness of using the Eveready method, still unexplained by Proximo/Agavera are the allegations of their counterclaim in which they assert that "1800 Tequila is currently one of the top five selling tequila brands in the United States," "**substantial sums have been expended** on promotion and advertising in order **to establish and maintain consumers' awareness and recognition of the 1800 Trade Dress** and **to create an association in their mind [sic] between the 1800 Trade Dress and its source and origin**" and "long before the acts of the counter-claim defendants complained of herein, and as the result of the promotion

9

and sale of 1800 Tequila, **the 1800 Trade Dress has acquired a valuable reputation and distinctiveness and is now recognized by consumers as originating from and being associated with a single source**." (Doc. 85 at 8, emphasis added)

After thoughtful consideration, the Court finds that Dr. Ford's survey was conducted according to accepted principles. Clicks, at 1263. Moreover, the Court finds that Proximo/Agavera's contentions regarding Dr. Ford's survey go to the weight of the evidence, not its admissibility. Prudential Ins. Co. v. Gibraltar Fin. Corp., 694 F.2d 1150, 1156 (9th Cir. 1982), cert. denied, 463 U.S. 1208, 77 L. Ed. 2d 1389, 103 S. Ct. 3538 (1983). ("Technical unreliability goes to the weight accorded a survey, not its admissibility."). As in Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., 618 F.3d 1025, 1037-1038 (9th Cir. Cal. 2010), the defects raised by Proximo/Agavera have been determined by the Ninth Circuit not to impact the admissibility of the survey. In Fortune, the Court held,

> To be sure, as Victoria's Secret argues and as the district court noted, the Marylander survey has a number of shortcomings, including the fact that it was conducted over the internet (thereby failing to replicate real world conditions), may have been suggestive, and quite possibly produced counterintuitive results. But these criticisms, valid as they may be, go to "issues of methodology, survey design, reliability, . . . [and] critique of conclusions," and therefore "go to the weight of the survey rather than its admissibility." Clicks Billiards, 251 F.3d at 1263; cf. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Additionally, the Court finds unpersuasive Proximo/Agavera's citations to the non-Ninth Circuit authorities, Winning Ways, Inc. v. Holloway, 913 F.Supp. 1454, 1465 (D. Kan. 1996) ("Winning Ways") and NFL Props, Inc. v. Prostyle, Inc., 57 F. Supp.2d 665 (E.D. Wis. 1999) ("NFL Properties"). Though both of these cases are offered as examples of cases where deficiencies in methodology warranted the survey's exclusion, the deficiencies noted in these cases are distinguishable from the deficiency claimed by Proximo/Agavera here. For example, in Winning Ways the court found "[m]ultiple flaws mar[ed] the value of the consumer survey evidence" including the order in which the product was provided responding consumer, an underinclusive definition of the consumer market, and an unrepresentative sample. Winning Ways, supra, 913 F.Supp. at 1466-1467. None of these defects were alleged here. Similarly in NFL, the court initially excluded the bulk of the expert's report because his survey asked an improperly formulated question and because the survey's conclusion was stated in

10

terms of what the public believed actually had happened as opposed to what they believed should have happened. NFL at 667. In excluding the report, the court held that "it will not 'accord trademark protection based upon the public's mistaken notion of the law." Id. Then in its later opinion, the court excluded the expert's reformulated report because it relied upon only the unobjectionable portion of the survey. Id. However, the court found that the edited survey was "seriously flawed" in that it asked only a single question and lacked the use of a control, which the expert had testified was "absolutely necessary." NFL, at 668-69.[12] Again, here, there are no complaints that these types of deficiencies existed in Dr. Ford's methodology.

Finally, Proximo/Agavera urges the Court to exclude the survey as unduly prejudicial pursuant to Federal Rule of Evidence 403. Rule 403 requires the court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. Without doubt, the survey evidence is prejudicial to the position of Proximo/Agavera but the court finds that this is so *only* because it has high probative value. Because the Court finds that the probative value is not outweighed by its prejudicial effect, the Court does not find that Rule 403 requires exclusion of this evidence at this time. Instead, the jury will have to decide what weight, if any, to afford the survey after considering Defendant's evidence.

### III.  CONCLUSION

Accordingly, the Court **ORDERS** that Defendants' October 14, 2011 motion to preclude testimony of Gerald Ford (Doc. 144) is **DENIED**.

IT IS SO ORDERED.

Dated:   **November 28, 2011**                              /s/ Jennifer L. Thurston
                                                              UNITED STATES MAGISTRATE JUDGE

---

[12] Likewise, Proximo/Agavera citation to Trouble v. Wet Seal, Inc., 2001 U.S. Dist. LEXIS 20846, 836-37 (S.D.N.Y. Dec, 14 2001) ("Trouble") is also unavailing as the Trouble Court also noted multiple deficiencies none of which are alleged by Proximo/Agavera here.